# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 2523 | **DATE** | 9/29/2004 |
| **CASE TITLE** | OCEAN ATLANTIC WOODLAND CORPORATION vs. DRH CAMBRIDGE HOMES, INC., et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 10/13/2004 at 9:30 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: The Court denies DRH Cambridge Homes, Inc., Gundmundson, Leder, Ltd., and Pugsley & LaHaie, Ltd.'s joint motion for summary judgment [doc. no. 134-1].

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | **Document Number** |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | SEP 29 2004 date docketed | 150 |
| ✓ | Docketing to mail notices. | | |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| CG | courtroom deputy's initials | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DISTRICT

| | | |
|---|---|---|
| OCEAN ATLANTIC WOODLAND CORPORATION, a Virginia Corporation, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Judge Ronald A. Guzmán |
| DRH CAMBRIDGE HOMES, INC., a California Corporation, COWHEY, GUNDMUNDSON, LEDER, LTD., an Illinois Corporation, and PUGSLEY & LAHAIE, LTD., an Illinois Corporation, | ) ) ) ) ) ) ) | 02 C 2523  **DOCKETED**  SEP 2 9 2004 |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Ocean Atlantic Woodland Corporation ("Ocean Atlantic") has sued DRH Cambridge Homes, Inc. ("Cambridge"), Cowhey, Gundmundson, Leder, Ltd. ("Cowhey"), and Pugsley & LaHaie, Ltd ("Pugsley") alleging copyright infringement, deceptive trade practices and consumer fraud, conversion, false designation of origin, and unjust enrichment. Before the Court is Defendants' joint motion for summary judgment based on several affirmative defenses. For the reasons provided in this Order, the Court denies Defendants' summary judgment motion.

## FACTS

The following facts are either undisputed or deemed admitted due to a party's noncompliance with Local Rule 56.1. In 1994, owners of farm land located in unincorporated Will County adjacent to the Village of Plainfield, Illinois ("the Village") entered into a contract with Mid-America Financial Development, Inc. ("MAF"), a residential developer, for the

150

purchase of the farm land. (Defs.' LR 56.1(a)(3) ¶¶ 20, 22.) MAF's name for the proposed development was "Sweetwood." (*Id.* ¶ 23.)

MAF made substantial progress toward its goal of having the Village annex the farm land. (*Id.* ¶ 29.) The Village required a party petitioning for annexation to prepare and submit, among other things, a Preliminary Plat showing the plans for such things as street locations, lot configurations and relative lot sizes, and Preliminary Engineering showing such things as the plans for locations of sanitary sewers, storm water drainage systems, and detention basins. (*Id.* ¶ 16.)

MAF hired Roake & Associates ("Roake"), a land surveying and engineering firm, to create a Preliminary Plat and Preliminary Engineering and to assist in the development efforts. (*Id.* ¶ 24.) The Preliminary Plat and Preliminary Engineering were both submitted to the Village, and the Village planning commission recommended that the Village board approve them. (*Id.* ¶ 30.) The farmers, MAF, and the Village then entered into an annexation agreement, the terms of which were agreed to by the parties. (*Id.* ¶ 31.) However, the last required stage, board approval, did not occur. (*Id.* ¶¶ 30, 32; Defs.' Ex. 15, Philipchuck Dep. at 18-19.) MAF decided not to proceed with its acquisition and development of the farm land. (Defs.' LR 56.1(a)(3) ¶ 32.) MAF paid Roake in full for all of the services it performed on MAF's behalf. (*Id.* ¶ 46.) Either MAF or Roake then provided copies of the Preliminary Plat and Preliminary Engineering to the owners to show that MAF or Roake had pursued the project in good faith and to allow the owners to show potential buyers the work that had progressed to date in order to induce them to purchase the land and to continue to use Roake. (*Id.* ¶ 33; Philipchuck Dep. at 115-16.)

In 1997, within months after MAF and Roake's collaboration of work had ended, the

Farmers entered into an agreement to sell the farm land to Ocean Atlantic. (*Id.* ¶ 37.) At some

point in time, Ocean Atlantic stated that it intended to develop the farm land into a residential

subdivision named "Farmington Village." (Pl.'s LR 56.1(b)(3)(B) ¶ 4.) The agreement required

Ocean Atlantic to close on November 15, 1997[1] and to complete rezoning and annexation of the

farm land into the Village prior to the closing date. (Defs.' LR 56.1(a)(3) ¶¶ 41, 42.) The

farmers gave all engineering, preliminary plats, soil tests, studies, and due diligence conduct by

MAF to Ocean Atlantic. (*Id.* ¶ 44.) Mr. Michael Ferraguto, president of Ocean Atlantic, does

not recall whether Ocean Atlantic was asked to reimburse MAF for any work Roake had done

prior to Roake's retention by Ocean Atlantic. (*Id.* ¶ 46.) Ocean Atlantic wanted to proceed with

a plan similar to the MAF plan and wanted to take the MAF documents and start the ball rolling

again. (*Id.* ¶ 39.)

Ocean Atlantic retained Roake to continue work in connection with the annexation

process and retained attorney John Philipchuck to assist in the annexation process. (*Id.* ¶ 43.)

Ocean Atlantic also retained The Lannert Group ("Lannert") as the landscape architect to create a

Preliminary Landscaping Plan for Farmington Village. (*Id.* ¶ 49.) By the time Ocean Atlantic

retained Lannert, the creative portion of the project had been pretty much settled. (*Id.* ¶ 51.)

The Village conducted new hearings regarding the farm land because the last step in the

process, board approval, had not occurred. (*Id.* ¶ 55.) Roake and Lannert revised the Preliminary

Plat that had been prepared for MAF's Sweetwood subdivision in response to comments by

Village officials and requests by Ocean Atlantic. (*Id.* ¶ 56.) The record before the Court does

---

[1]The November 15, 1997 closing date came and went, and because the parties realized
that they were not able to meet that deadline, the farmers later extended the initial closing
deadline. *Arnhold v. Ocean Atl. Woodland Corp.*, 284 F.3d 693, 695-96 (7th Cir. 2002).

not make it clear to what degree the revised Preliminary Plat changed the original plan. The Preliminary Landscape Plan, Preliminary Engineering, as well as the revised Preliminary Plat were each approved by the Village board. (*Id.* ¶ 58.)

In August 1998, Ocean Atlantic, the Village, and the farmers entered into an annexation agreement ("Annexation Agreement") which incorporated the Preliminary Landscape Plan and revised Preliminary Plat as exhibits. (*Id.* ¶ 59.) The version of the Preliminary Plat, which shows only Lannert as its drafter, was based on the preliminary plat drafted by Roake for MAF. (*Id.* ¶ 61.)

At that time, the Village board adopted Ordinances 1804 and 1805. (*Id.* ¶ 66.) Ordinance 1804 authorized the Village President and Village to execute the Annexation Agreement and incorporated by reference the agreement, which included the Preliminary Plat and Preliminary Landscape Plan as exhibits, which is attached to the ordinance. (*Id.*) Ordinance 1805 annexed the farm land to the Village. (*Id.*) None of the documents submitted to the Village in connection with the annexation process by Ocean Atlantic or Roake and Lannert contained any limitation on redistribution. (*Id.* ¶ 75.)

Despite its development efforts, Ocean Atlantic did not close on the property at any time in 1998. (*Id.* ¶ 81.) By fall 1998, the farmers had "accused Ocean Atlantic of dragging its feet by refusing to draft a final engineering plan, which , upon approval by the Board, would have triggered a mandatory closing date within thirty days." *Arnhold*, 284 F.3d at 696. The farmers "expressed frustration over Ocean Atlantic's repeated proposals to renegotiate the purchase price of the land." *Id.*; (*see* Defs.' LR 56.1(a)(3) ¶ 84). The farmers "retaliated by refusing to execute any annexation petition unless Ocean Atlantic accelerated the first closing date to December 31,

1998." *Arnhold*, 284 F.3d at 696.

"[U]nbeknownst to the Sellers, Ocean Atlantic filed a federal lawsuit in November 1998, asking the court to order the Sellers to sign the requisite annexation petition. The Sellers, on their own accord, did execute the document on December 1, 1998." *Id.* This mooted Ocean Atlantic's lawsuit. *Id.* "Nevertheless, . . . Ocean Atlantic proceeded to serve the Sellers in January 1999 with its now moot lawsuit for specific performance. Three months later, Ocean Atlantic voluntarily dismissed its suit and dropped its demand for a price reduction." *Id.* "The parties subsequently agreed to a second extension of the contract, which pushed back the initial date of closing to November 30, 1999." *Id.*

In early November 1999, "Ocean Atlantic sought to delay the initial closing for a third time." *Id.*; (*see* Defs.' LR 56.1 ¶ 87). On November 22, 1999, the farmers filed a federal suit against Ocean Atlantic "seeking a declaratory judgment that the contract would be terminated if the closing did not occur by November 30, 1999." *Arnhold*, 284 F.3d at 696; (*see* Defs.' LR 56.1 ¶ 88). Ocean Atlantic failed to close by November 30, 1999, and the lawsuit proceeded. (Defs.' LR 56.1(a)(3) ¶ 88.)

In Fall 2000, shortly before trial, the farmers and Ocean Atlantic entered into a settlement agreement that established a "drop-dead" closing date of January 25, 2001. (*Id.* ¶ 89.) On January 18, 2001, Ocean Atlantic demanded that the closing date be moved to May 1, 2001. (*Id.* ¶ 90.) Although the farmers were prepared to close on or before January 25, 2001, Ocean Atlantic did not close on that date. (*Id.* ¶ 93.) On February 28, 2001, the district court held and on March 21, 2002, the Seventh Circuit affirmed that because Ocean Atlantic did not close by the drop-dead closing date, Ocean Atlantic lost any right to purchase the farm land and forfeited its

development costs. *Arnhold v. Ocean Atl. Woodland Corp.*, 132 F. Supp. 2d 662, 674 (N.D. Ill. 2001), *aff'd*, 284 F.3d at 709.

On December 29, 2000, prior to Ocean Atlantic's loss of any right to purchase the farm land, Ocean Atlantic as "contract purchaser" entered into a real estate sales contract with Cambridge, a defendant in the instant case, to purchase a substantial part of the farm land, *i.e.*, 380 of 681 lots. (Defs.' LR 56.1(a)(3) ¶ 102; Defs.' Ex. 31, Farmington Village Brochure.) Further, a real estate agency's brochure for Farmington Village shows that Ocean Atlantic advertised for sale 681 lots, and thus Ocean Atlantic intended to sell most of the farm land. (Defs.' LR 56.1(a)(3) ¶ 125.) When Ocean Atlantic failed to close on its purchase of the farm land on January 25, 2001, the real estate contract between Ocean Atlantic and Cambridge terminated pursuant to its terms. (*Id.* ¶ 106.)

In April 2001, a little over a month after the district court had ruled that Ocean Atlantic had lost any right to purchase the farm land, Cambridge entered a contract with the farmers to purchase the farm land. (*Id.* ¶ 107.) In April or May 2001, Cambridge hired Cowhey, an engineering and design firm, to prepare the civil engineering plans for Cambridge's residential subdivision named Liberty Grove. (Pl.'s LR 56.1(b)(3)(B) ¶ 108.) In May 2001, Cambridge informed Cowhey that the project was subject to the Village's Annexation Agreement. (Defs.' Ex. 45, Micheli Aff. ¶ 9.) The plans referred to and attached to the Annexation Agreement were insufficient by themselves for the construction of Liberty Grove. (*Id.* ¶ 12.) Thus, Cowhey conducted its own preliminary site investigation, site analysis, calculations, and engineering plans and projects for Liberty Grove. (*Id.*)

Starting in May 2001, at the request of Cambridge, Cowhey performed site investigation, site analysis, calculations and plan and drawing preparation, which necessitated Cowhey's:

(1) obtaining permits for the development from the Environmental Protection Agency, the Illinois Department of Natural Resources, the Illinois Historic Preservation Agency, the Illinois Department of Transportation, and the Will County Land Use Department;

(2) conducting the initial site investigation and site research that included research of soil conditions, site topography, floodplain/wetlands designations, Illinois Department of Transportation requirements and Village of Plainfield ordinances and requirements, offsite easements, existing utilities, existing sources of water and sewer, storm sewer alternates, storm sewer system outfall points and alternates, and offsite watermain routing;

(3) attending various meetings with the Village of Plainfield and the Illinois Department of Transportation;

(4) reviewing site geometry and development plats from survey (Midwest Technical Consultants);

(5) conducting a preliminary hydraulic analysis that included an analysis of existing depressional areas, offsite tributary areas, 100 year flood routing, downstream capacities, and drain tiles;

(6) preparation of an existing and proposed model of subsurface with offsite areas;

(6) preparation of final hydraulic design/drafting, including a detention basin design and analysis, volume calculations, release structures, and a 100 year flood route;

(7) preparation of a preliminary grading design and plans, including centerline grading, a soil erosion control plan and a preliminary earthwork analysis;

(8) preparation of a final grading design and plans, including earthwork design, complete lot grading (including rear yards), open space grading, street grading, 100 year flood routing, driveway slopes, and Route 126 road widening and ditch grading;

(9) preparation of an erosion control design and plans, including stockpile locations, silt fence locations, seeding and blankets, straw bales, and construction entrances;

(10) preparation of utility design/layout and plans, including offsite and onsite horizontal layout of storm sewer, offsite and onsite horizontal layout for watermain, and offsite and onsite horizontal layout of sanitary;

(11) preparation of final utility design and plans, including offsite and onsite sanitary, watermain and storm sewer with all sizes, locations, depths and services areas, along with storm sewer tributary areas and sump pump connections;

(12) preparation of pavement design and plans, including a typical pavement cross-section design, pavement thickness, and Route 126 geometry and cross-section;

(13) preparation of final pavement plans, including details of the Route 126 road widening, cross sections, and auger under IDOT road and tapering;

(14) preparation of street lighting and signage design and plans, including locations, sizes, specification, type and number;

(15) preparation of construction standard details, including erosion controls, mass grading and underground;

(16) preparation of numerous Village and State submissions for review, comment, and approval;

(17) additional final engineering, including plans for an alternate lift station and forcemain design for sanitary sewer outfall, design grading and utility plan for the School Site and design grading and utility plan for the Swim Club.

(*Id.*; Defs.' Ex. 45, Micheli Aff. ¶ 6.) Cowhey's work required hundreds of pages of civil engineering drawings, in the form of plan segments, draft drawings, preliminary engineering plans and final engineering plans. (Defs.' Ex. 45, Micheli Aff. ¶¶ 5, 7.) Cambridge, Cowhey, an engineering and design firm, and Pugsley, a landscaping architect, completed the storm water detention basin and sanitary sewer, water main and storm sewer system, undertook grading of streets, and began development of the school site.[2] (Defs.' LR 56.1(a)(3) ¶ 112.)

---

[2]During the pendency of the instant litigation, the school was built and ready for the fall 2003 term. (*Id.* ¶ 121.)

At some time between March and May 2001, Roake communicated to Eric Sandstedt, Cambridge's Vice President of Land Development, what Ocean Atlantic's expenses had been on the Farmington Village project to date pursuant to Roake and Sandstedt's discussion about reimbursing Ocean Atlantic for the work that Roake had done for Ocean Atlantic. (*See* Pl.'s LR 56.1(b)(3)(B) ¶ 100; Pl.'s Ex. 15, Roake Aff. ¶¶ 3-4.)

On June 7, 2001, approximately one month prior to Cambridge's closing date, an employee of Cambridge's surveyor, Midwest Technical Consultants ("MTC"), called Lannert and asked for a copy of the Preliminary Plat. (Pl.'s LR 56.1(b)(3)(B) ¶ 112.) J. Christopher Lannert stated "as is our normal process, we don't give out our work. We don't give copies of plans to people who call without checking with our [sic] owner." (*Id.* ¶ 116; *see id.* ¶ 115.) J. Christopher Lannert called Ferraguto, Ocean Atlantic's president, who told him not to send Cambridge copies of the plans. (*Id.* ¶ 113.) J. Christopher Lannert denied MTC's request. (*Id.*)

On June 8, 2001, MTC contacted the Village of Plainfield in order to obtain a copy of the Preliminary Plat. (*Id.* ¶ 117.) By June 12, 2001, MTC obtained a full-size copy of the Preliminary Plat from the Village. (*Id.* ¶ 118.) MTC could not prepare a Geometric Base Sheet without the full-sized copy of the Preliminary Plat. (*Id.* ¶ 121.) In addition, before Cowhey could prepare plans for Liberty Grove, it needed a copy of the Geometric Base Sheet prepared by MTC. (*Id.* ¶ 124.)

On July 19, 2001, Cambridge closed on its contract. (Defs.' LR 56.1(a)(3) ¶ 108.) After Cambridge acquired the property, it hired consultants and contractors, including Cowhey, to conduct extensive testing and studies to prepare final engineering plans, as discussed above. (*Id.* ¶ 111.)

On August 2001, Cambridge instructed Pugsley, its landscape architect, to prepare final landscape drawings. (Pl.'s LR 56.1(b)(3)(B) ¶ 130.) Before Pugsley could begin working on the final landscape drawings, it needed a set of Cowhey's engineering, grading, and utility plans. (*Id.* ¶ 131.) Thus, on August 23, 2001, Cowhey sent Pugsley sets of the engineering plans Cowhey had drafted. (*Id.* ¶ 132.) Pugsley was going to use Cowhey's engineering plans and grading and utility plans for the base of its landscape plans. (*Id.* ¶ 133.) Kyle Weber of Pugsley referenced Lannert's Landscape Plan as included in the Annexation Agreement for purposes of visually scaling the size and square footage of the sign and entry monument for Liberty Grove. (*Id.* ¶¶ 136-37; Pl.'s Ex. 39, Weber Dep. at 84-85.)

On November 14, 2001, Cambridge filed its plans with the Village. (*Id.* ¶ 147.) If Cambridge did develop the farm land, it was obligated to take the necessary steps to develop it in conformance with the Preliminary Plat and Landscape Plan attached to the Annexation Agreement. (Defs.' LR 56.1(a)(3) ¶ 120.) Mr. Terrance Burghard, the Village Administrator, testified that an annexation agreement runs with the property. (*Id.*; Pl.'s LR 56.1(b)(3)(A) ¶ 120.)

On January 14, 2002, Ocean Atlantic submitted a Freedom of Information Act Request to the Village. (Pl.'s LR 56.1(b)(3)(B) ¶ 148.) Ocean Atlantic requested all documents relating to the Liberty Grove development and all correspondence with Cambridge Homes. (Pl.'s Ex. 48, FOIA Request of 1/14/02 at 3.)

On February 18, 2002, Ocean Atlantic obtained the intellectual property rights and interest that Roake and Lannert had in the work they had performed for Ocean Atlantic. (*Id.* ¶ 113; Pl.'s LR 56.1(b)(3)(B) ¶ 150.) Ocean Atlantic did not compensate either Roake or Lannert for the assignment of the intellectual property rights. (Defs.' LR 56.1(a)(3) ¶ 114.)

10

On February 21, 2002, Ocean Atlantic sent cease and desist letters to Cambridge and Cowhey. (Pl.'s LR 56.1(b)(3)(B) ¶ 153.) On February 25, 2002, Ocean Atlantic sent a cease and desist letter to the Village with regard to distribution of the plans at issue. (*Id.* ¶ 154.)

On February 28, 2002, Ocean Atlantic filed copyright registrations for Landscape Plan 98080004 and Farmington Village - Preliminary Engineering 5291P5 with the United States Copyright Office. (Pl.'s LR 56.1(b)(3)(B) ¶ 155.) The Landscape Plan 98080004 copyright is for the Preliminary Plat that was submitted to the Village and incorporated into the Annexation Agreement. (Defs.' LR 56.1(a)(3) ¶ 117.) The Farmington Village - Preliminary Engineering 5291P5 copyright is for the Preliminary Engineering that was derived from the Preliminary Plat. (*Id.*)

On April 9, 2002, Ocean Atlantic filed the instant lawsuit against Defendants for copyright infringement, deceptive trade practices and consumer fraud, conversion, false designation of origin, and unjust enrichment. Defendants raised numerous affirmative defenses, some of which are the bases for the summary judgment motion as discussed below.

## DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences in a light most favorable to the non moving party, a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248

(1986).  For the purposes of summary judgment, the movant has the burden of proving that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

In short, disputed issues of material fact abound in this case.  The record shows that practically every issue of material fact has been properly disputed with regard to the affirmative defenses on which Defendants rely.  Accordingly, based on the record before the Court, entry of summary judgment would be improper.

First, with regard to Defendants' affirmative defense of express and implied license, material issues of fact are disputed.  It is "well-settled that a non-exclusive license is not a transfer of ownership, and is not, therefore, subject to the writing requirement of [17 U.S.C.] § 204."  *Johnson v. Jones,* 149 F.3d 494, 500 (6th Cir. 1998).  An implied nonexclusive license is created "when (1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor-requestor intends that the licensee copy and distribute his work."  *I.A.E., Inc. v. Shaver,* 74 F.3d 768, 776 (7th Cir. 1996).  An express nonexclusive license may be granted orally or in writing.  *Cf. Korman v. HBC Fla. Inc.,* 182 F.3d 1291, 1293 (11th Cir. 1999).

Plaintiff argues and Defendants dispute that at all times it was an *exclusive* licensee, but it has not shown the required written agreement to that effect.  (Defs.' LR 56.1(a)(3) ¶ 124; Pl.'s LR 56.1(b)(3)(B) ¶ 65; *see* 17 U.S.C. § 204.  The plans themselves state that they were authored by Lannert.  (Defs.' LR 56.1(a)(3) ¶ 61.)  Further, Roake testified that he owned the plans.  (Pl.'s LR 56.1(b)(3)(B) ¶ 101.)  However, he also testified that the plans could not be used without the consent of Ocean Atlantic or payment to Ocean Atlantic for the work Roake had performed for Ocean Atlantic.  (*Id.* ¶ 100.)  The record shows disputed facts that would support that the farmers

had a license to develop the land, such that Cambridge as a successor in interest, may have had a license to develop the farm land pursuant to the Annexation Agreement. (Defs.' LR 56.1(a)(3) ¶ 33.) Although it is undisputed that the parties to the Annexation Agreement included the Village, Ocean Atlantic, and the Owners, without a definitive answer as to the basic question of who had what rights in the plans at the time, the Court cannot even begin to answer the question whether the Annexation Agreement itself created an express license or whether the conduct of any owner/licensor shows any intent to create an implied license. Thus these issues must be decided by the trier of fact.

Second, Defendants argue that they were entitled to use the plans at issue because the plans became the "law of the land" when the Village enacted Ordinance 1804, which authorized the Village President and Village to execute the Annexation Agreement and incorporated by reference the agreement, which itself included the Preliminary Plat and Landscape Plan as exhibits, and Ordinance 1805, which annexed the farm land to the Village. (See Defs.' LR 56.1(a)(3) ¶ 66.) However, the record is replete with disputed issues of material fact as to the intent of all of the parties involved. Defendants state and Plaintiff disputes that the Annexation Agreement incorporated in the Village Ordinances 1804 and 1805 were intended to benefit the public as a whole. (Id. ¶¶ 75, 120, 122.) Plaintiff argues that the Annexation Agreement incorporated in Ordinances 1804 and 1805 was a private agreement intended to benefit only the parties to the agreement. (Pl.'s LR 56.1(b)(3)(A) ¶ 60; Pl.'s LR 56.1(b)(3)(B) ¶ 58.) Determination of the issue of intent is peculiarly within the province of the finder of fact.

Third, Defendants contend that the undisputed facts regarding their unclean hands/copyright misuse affirmative defense warrants entry of summary judgment in their favor.

"[T]he equitable defense of copyright misuse . . . has its historical roots in the unclean hands defense and is a complete bar to enforcement of one's copyright." *qad Inc. v. ALN Assocs. Inc.*, 974 F.2d 834, 836 (7th Cir. 1992). "The doctrine of misuse 'prevents copyright holders from leveraging their limited monopoly to allow them control of areas outside the monopoly.'" *Assessment Techs. of WI, LLC v. WIREdata, Inc.*, 350 F.3d 640, 647 (7th Cir. 2003) (quoting *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1026-27 (9th Cir. 2001)).

Copyright misuse claims are tested under conventional antitrust principles. *USM Corp. v. SPS Techs., Inc.*, 694 F.2d 505, 512 (7th Cir. 1982). "It is . . . well settled that concerted and contractual behavior that threatens competition is not immune from antitrust inquiry simply because it involves the exercise of copyright privileges." *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1186 n.63 (1st Cir. 1994); *see Chamberlain Group, Inc. v. Skylink Techs., Inc.*, No. 04-1118, ___ F.3d ___, 2004 WL 1932660 (Fed. Cir. Aug. 31, 2004) ("Because nothing in Seventh Circuit law contradicts *Data General*, we similarly conclude that it is the standard that the Seventh Circuit would most likely follow.") (star pagination unavailable). As the Supreme Court has stated: "The Court has held many times that power gained through some natural and legal advantage such as a patent, copyright, or business acumen can give rise to liability if 'a seller exploits his dominant position in one market to expand his empire into the next.'" *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 479 n.29 (1992) (quoting *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 611 (1953)).

Defendants argue that Plaintiff is using its ownership of the copyrights to gain an unfair advantage in the real estate market or real estate development market by forcing them either to sell the land to Ocean Atlantic or to give Ocean Atlantic the right to develop the land, (Defs.' Ex.

46, Ferraguto Dep. at 15), rights which Ocean Atlantic had lost previously, *Arnhold*, 132 F. Supp. 2d at 674, *aff'd*, 284 F.3d at 709. This may very well be. However, additional facts are necessary regarding how Ocean Atlantic's purported conduct violates conventional antitrust principles in order to determine whether copyright misuse has occurred or is occurring.

Fourth, Defendants rely on a laches defense. "[T]he doctrine of laches . . . is 'principally a question of the inequity of permitting a claim to be enforced.'" *Miller v. City of Indianapolis*, 281 F.3d 648, 653 (7th Cir. 2002) (quoting *Lingenfeller v. Keystone Consol. Indus.*, 691 F.2d 339, 340 (7th Cir. 1982). "The defense of laches bars an action when the plaintiff's delay in filing the claim (1) is unreasonable and inexcusable, and (2) materially prejudices the defendant." *Smith v. Caterpillar, Inc.*, 338 F.3d 730, 733 (7th Cir. 2003). Laches "should not be determined merely by a reference to and a mechanical application of the statute of limitations. The equities of the parties must be considered as well." *Gardner v. Panama Ry. Co.*, 342 U.S. 29, 31 (1951). The Seventh Circuit has emphasized that "[l]aches is based not on simply the passage of time, as is a statute of limitations, but rather upon changes of conditions or relationships." *Miller*, 281 F.3d at 653. The onus of explaining the delay in filing its lawsuit rests with the plaintiff. *Id.* An exception to the doctrine is that "laches does not bar an action against a defendant who knew of plaintiff's asserted rights or against a deliberate infringer." *Harmony Gold U.S.A., Inc. v. FASA Corp.*, No. 95 C 2972, 1996 WL 332689, at *3 (N.D. Ill. Jun 13, 1996).

Plaintiff raises various genuine disputes regarding key facts that would preclude the application of laches in this case. First, Plaintiff states and Defendants dispute that, at the earliest, constructive knowledge of Defendants' infringement occurred in November 2001, when Defendants' filed their plans with the Village, and accordingly that its filing of a lawsuit five

months later does not rise to the level of laches. (Pl.'s LR 56.1(b)(3)(B) ¶ 147.) Defendants argue that Plaintiff knew as early as August 1998 that subsequent owners would be required to develop the farm land in accordance with the Preliminary Plat and the Preliminary Landscape Plan, (Defs.' LR 56.1(a)(3) ¶¶ 59, 66-67; Pl.'s LR 56.1(b)(3)(A) ¶¶ 59, 66-67), and that at the very latest on December 29, 2000, Ocean Atlantic knew Cambridge intended to buy a substantial parcel of the farm land from Ocean Atlantic when the two parties entered a contract for 380 of the 681 lots, (Defs.' LR 56.1(a)(3) ¶ 102; Defs.' Ex. 31, Farmington Village Brochure). Further, Ocean Atlantic may have known as early as May 2001 that Cambridge was using the plans because when Cambridge sought a full-sized copy of the plans in May 2001 from Lannert, Lannert told Ocean Atlantic about the request. (Pl.'s Ex. 3, Lannert Dep. at 125.) Thus, there is a disputed issue of fact as to when Ocean Atlantic knew or should have known that Cambridge was using the plans. Second, Plaintiff states and Defendants dispute that in May 2001, prior to Defendants' purchase of the land, Roake prohibited Defendants from using or copying his plans without compensating Ocean Atlantic. (Pl.'s LR 56.1(b)(3)(B) ¶ 100.) Third, Plaintiff argues and Defendants dispute that during the first six to eight months of 2001, Plaintiff and Defendants attempted to negotiate a buy-out of Ocean Atlantic, which may or may not have included whatever rights Roake or Ocean Atlantic had in the plans. (Pl.'s Ex. 5, Hyman Dep. at 143-44.) Accordingly, due to all of these disputed facts, the Court cannot grant summary judgment as to laches.

Fifth, Defendants argue that Plaintiff's claims for damages are barred by the res judicata and collateral estoppel effect of *Arnhold*, 132 F. Supp. 2d at 674, *aff'd*, 284 F.3d at 709. When the earlier cause of action is filed in federal court, the federal rules of res judicata and collateral

16

estoppel are applicable. *Havoco of Am., Ltd. v. Freeman, Atkins & Coleman, Ltd.*, 58 F.3d 303, 307 n.6 (7th Cir. 1995) (collateral estoppel); *EEOC v. Harris Chernin, Inc.*, 10 F.3d 1286, 1289 n.4 (7th Cir. 1993) (res judicata).

"One of the fundamental purposes of the doctrine of res judicata is that of repose for litigants. Res judicata protects a victorious party from being dragged into court time and time again by the same opponent on the same cause of action." *Magnus Elecs., Inc. v. La Republica Argentina*, 830 F.2d 1396, 1403 (7th Cir. 1987) (citations omitted). "The three requirements for res judicata under federal law are: (1) an identity of the parties or their privies; (2) an identity of the causes of actions; and (3) a final judgment on the merits." *Central States, Southeast & Southwest Areas Pension Fund v. Hunt Truck Lines, Inc.*, 296 F.3d 624, 628 (7th Cir. 2002). "[R]es judicata bars not only those issues which were actually decided in the prior action but also any issues which could have been raised." *Lee v. City of Peoria*, 685 F.2d 196, 198 (7th Cir. 1982).

"Collateral estoppel refers to a judgment's effect of foreclosing relitigation in a subsequent action of an issue of law or fact that has been actually litigated and decided in the initial action." *Havoco*, 58 F.3d at 307 (quotations omitted). Collateral estoppel is applicable when "(1) the issue sought to be precluded is the same as that involved in the prior action; (2) the issue was actually litigated; (3) the determination of the issue was essential to the final judgment; and (4) the party against whom estoppel is invoked was fully represented in the prior action." *Id.*

In the previous litigation, Ocean Atlantic sought to enforce its settlement agreement with the farmers and to obtain specific performance of that agreement. *Arnhold*, 132 F. Supp. 2d at 666-69. The district court held that the farmers were entitled to terminate the agreement and, in

doing so, held that the farmers suffered disproportionate prejudice by Ocean Atlantic's failure to

close by the drop-dead date of January 25, 2001, a material breach, although Ocean Atlantic

spent $1.7 million in fees and expenses relating to the annexation, rezoning, planning,

preliminary engineering, and marketing of the property between 1997 and 2001. *Id.* at 672-73.

The district court held that Ocean Atlantic forfeited the $1.7 million and noted that although

"equity does abhor forfeitures, Illinois law does allow forfeiture where the contract provides for

it, as the Settlement Agreement in this case does." *Id.* at 673. The pertinent provision of the

Settlement Agreement between the farmers and Ocean Atlantic provided:

> If Closing has not occurred on or before January 25, 2001, for any reason other
> than Sellers' default, as found by the Court, or Sellers' failure to participate in or
> fully cooperate as set forth herein, as found by the Court, Purchaser shall have no
> right to purchase or otherwise encumber the Property or Homestead parcel, the
> Contract shall be terminated and Purchaser shall have no rights with respect to the
> Property or Homestead Parcel.

*Id.* at 667. The Seventh Circuit affirmed and stated "it is neither unreasonable nor unfair for the

Sellers to avail themselves of any extent to which Ocean Atlantic's $1.7 million expenditures

have improved the value of the Sellers' property." *Arnhold*, 284 F.3d at 707. It further stated,

"we refuse to hold that it is unfair for Ocean Atlantic to forfeit all rights to the property, while the

Sellers retain the same property and all improvements thereto." *Id.* at 709.

In the instant action, Ocean Atlantic has sued Defendants for copyright infringement,

unfair competition, deceptive trade practices, false designation of origin, conversion, and unjust

enrichment with regard to the plans Roake and Lannert had created to develop the farm land.

Defendants argue that the *Arnhold* courts held that the farmers (who then sold to Cambridge such

that Cambridge is a successor in interest), retained all improvements to the land that resulted

from the $1.7 million dollars of work Ocean Atlantic had performed. Defendants argue that Ocean Atlantic is utilizing its copyrights to force Cambridge to sell the land to Ocean Atlantic and to recover its development costs. (Defs.' Ex. 46, Ferraguto Dep. at 15.) Thus, Defendants aver that Plaintiff seeks to recover rights to the land and the improvements that the *Arnhold* courts held it had forfeited. Plaintiffs, of course, disagree. As discussed above, it is disputed whether the farmers had an implied non-exclusive license to use the plans to develop the land. Thus, in this peculiar case, whether there is an identity of issues between Arnhold and the instant case is a disputed issue of fact which cannot be resolved on Defendants' summary judgment motion.

Lastly, Defendants argue that Ocean Atlantic's claims of deceptive trade practices and consumer fraud, conversion, false designation of origin, and unjust enrichment are derivative of its copyright claims. It is unclear what Defendants seek to gain by calling such claims "derivative." Defendants did not see fit to provide the law, save one case, on which they rely in support of their summary judgment motion as to these causes of action. The single case they cite merely highlights an issue of fact unaddressed by their statement of facts regarding whether home buyers typically care about who drafted the preliminary site drawings. Further, Defendants have failed to point to undisputed issues of material fact with regard to these causes of action that would support their motion. Clearly, more is required to meet the movants' burden on summary judgment. Accordingly, and for the reasons discussed above, the Court denies Defendants' motion for summary judgment as to these claims, as well the copyright claim.

This Court had previously bifurcated discovery as to infringement and damages. Because the Defendants' motion for summary judgment as to infringement is denied, the parties shall

conduct discovery as to all theories regarding damages, including profits,[3] limited to the Liberty Grove site, within sixty days of the date of this Memorandum Opinion and Order.

## CONCLUSION

For the reasons discussed above, the Court denies DRH Cambridge Homes, Inc., Gundmundson, Leder, Ltd., and Pugsley & LaHaie, Ltd.'s joint motion for summary judgment [doc. no. 134-1].

**SO ORDERED**                    ENTERED:  9/29/04

**HON. RONALD A. GUZMAN**
**United States Judge**

---

[3]Although the Court had previously withheld its ruling on Plaintiff's objections to Magistrate Judge Bobrick's prior exclusion of discovery as to profits as to the Liberty Grove site, the Court now holds that the parties may conduct discovery as to profits as to that site pursuant to 17 U.S.C. § 504(b), which provides that "[t]he copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." The Court adopts in full Magistrate Judge Bobrick's rulings as to the interrogatories, which were the subject of a motion to compel and motion for protective order, to the extent that they are not inconsistent with this Court's holding. After examination of the objections, the Court finds these rulings were not clearly erroneous or contrary to law.

20